# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Level 3 Communications, LLC, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 166 F.R. 2007 |
| | : | Submitted: September 14, 2016 |
| Commonwealth of Pennsylvania, | : | |
| Respondent | : | |

BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE ROBERT SIMPSON, Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE JULIA K. HEARTHWAY, Judge
HONORABLE JOSEPH M. COSGROVE, Judge

**OPINION BY JUDGE BROBSON**          **FILED:  December 8, 2016**

Pursuant to Pennsylvania Rule of Appellate Procedure 1571(i), the Commonwealth of Pennsylvania (Commonwealth) filed exceptions to this Court's three-judge panel opinion and order in *Level 3 Communications, LLC v. Commonwealth of Pennsylvania*, 125 A.3d 832, 836-37 (Pa. Cmwlth. 2015) (*Level 3 I*), dated October 15, 2015, in which the Court reversed an order of the Board of Finance and Revenue (Board), dated March 30, 2007.  In so doing, we concluded that Petitioner Level 3 Communications, LLC's (Level 3) sale of its (3)ConnectModem (3CM) service to America Online, Inc. (AOL) constitutes internet access and is, therefore, exempt from sales and use tax under the

Pennsylvania Tax Reform Code of 1971[1] (Tax Code) and the federal Internet Tax Freedom Act[2] (ITFA).  Upon careful review, we overrule the Commonwealth's exceptions.

The Commonwealth takes exception to the Court's ultimate finding and conclusion in *Level 3 I* that the 3CM service that Level 3 sold to AOL does not constitute a taxable telecommunication service but rather constitutes nontaxable Internet access.  In so doing, the Commonwealth takes exception with findings and conclusions distinguishing the technology utilized in the 3CM service that Level 3 sold to AOL in the matter now before the Court from the technology utilized in the service that Sprint Corporation (Sprint) sold to AOL in *America Online, Inc. v. Commonwealth*, 932 A.2d 332 (Pa. Cmwlth. 2007) (*AOL/Sprint*), *exceptions denied*, 942 A.2d 236 (Pa. Cmwlth.), *aff'd per curiam*, 963 A.2d 903 (Pa. 2008). This Court concluded that the service Level 3 sold to AOL in the matter now before the Court constituted nontaxable Internet access, whereas the service Sprint sold to AOL constituted a taxable telecommunications service.  More specifically, the Commonwealth takes exception to several of the Court's technological findings that the Court relied upon in reaching the determination that the 3CM service constitutes nontaxable Internet access.  For instance, the Commonwealth challenges the finding that Level 3's Point-of-Presence (PoP) is where the AOL end-user's connection to the Internet begins; instead, the Commonwealth contends that the connection to the Internet begins at AOL's PoP, which is the AOL data

---

[1] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7101-10004.

[2] Pub. L. No. 105-277, Div. C, Title XI, §§ 1100-1104, 112 Stat. 2681-719 (1998) (current version at 47 U.S.C. § 151.)

2

center. The Commonwealth also challenges the findings that after Level 3's equipment converts dial-up analog calls to digital Internet protocol (IP), Level 3 transmits the digital signal over its IP network to the "requested IP ADDRESS" and that the 3CM service that Level 3 sold to AOL provides the same functions as the version of the 3CM service Level 3 sold to Internet Service Providers (ISPs) that do not maintain a data center. The Commonwealth focuses much attention on its challenge to the findings that delivering an AOL end-user to the AOL data center is no different than delivering an end-user to websites such as www.msn.com or www.google.com and that a hacker by-passing the AOL data center demonstrates that it is not necessary to deliver AOL end-user traffic to the AOL data center in order for the end-user to access the internet. Finally, the Commonwealth takes issue with the Court's finding that Level 3's Virtual Private Network (VPN) provided "tunnels" from Level 3's modem bank through Level 3's IP network infrastructure to the AOL data center.[3]

The Commonwealth contends that the Court, in issuing its findings and conclusions, overlooked the following: (1) that Level 3 performs a domain name service (DNS) routing for the limited purpose of routing the AOL end-user's call exclusively to one of four AOL data centers and that AOL, not Level 3, performs the DNS routing to the World-Wide-Web destination specified by the end user; (2) that AOL, not Level 3, creates the end-users Internet session; (3) that the contract between Level 3 and AOL contains no reference to the provision of

---

[3] The Commonwealth maintains that Level 3 used the VPN tunnel to transmit AOL end-user traffic between Level 3's modem bank and Level 3's gateway. Between Level 3's gateway and the AOL data center, the Commonwealth contends that Level 3 used private lines solely dedicated to carrying AOL end-user traffic.

3

Internet access or routing of AOL end-user traffic to the Internet and that the contract describes the service sold by Level 3 to AOL as a managed modem service delivered directly to or received from a limited number of AOL data centers; (4) that Level 3 converted AOL end-user analog calls to digital IP format at Level 3's modem banks, transmitted the IP traffic over Level 3's IP network to Level 3's gateways and then used private lines to transmit the digital signal between Level 3's gateway and the AOL data center; and (5) that the 3CM service is the telecommunications service AOL purchased to deliver Internet access to AOL end-users and, as such, is subject to tax. The Commonwealth argues that these "overlooked" facts support the conclusion that the Court erred in determining that Level 3's 3CM service that it sold to AOL constitutes nontaxable Internet access.

The Court, in *Level 3 I*, examined the technological aspects of the 3CM service and opined, as follows:

> [T]here are fundamental technological differences between Sprint's [port modem management (PMM)] service and Level 3's 3CM service. *AOL/Sprint*, therefore, is not controlling in this case. Furthermore, these technological differences are material. The Level 3 facility, as the point at which the end-user connects with the network access point and network access servers, is a Point of Presence (PoP)—"an access point, location or facility that connects to and helps other devices establish a connection with the [i]nternet." (Resp't Br. Appx. B.) Because the Level 3 facility is a PoP, it is where the end-user's connection to the internet begins. The 3CM service, therefore, constitutes internet access—a service "furnished via an arrangement of physical transmission, routing and switching facilities that utilize the [Transmission Control Protocol/Internet Protocol (TCP/IP)] protocol suite and that provide connectivity between individual end-user[s] . . . and the . . . [i]nternet." (Resp't Br. Appx. B.) To the extent the

4

Commonwealth argues that the 3CM service was not internet access because it always delivered AOL's end-users to www.aol.com first, we find this unpersuasive for two reasons: (1) delivering an end-user to www.aol.com as a homepage is no different than delivering an end-user to www.msn.com or www.google.com; and (2) a skilled end-user could hack the AOL software and direct that a different homepage be used, bypassing the mandatory stop at www.aol.com and demonstrating that it is not necessary for an AOL end-user to visit www.aol.com in order to access the internet. (*See* Rebuttal Report of William H. Lehr, Expert Report submitted on behalf of Level 3, p. 8.)

The fact that Level 3's 3CM service provides internet access is dispositive. Internet access is an enhanced telecommunications service. 61 Pa. Code § 60.20(a). As an enhanced telecommunications service, it is excluded from the definition of telecommunications services. *Id.* Because the 3CM service is not a telecommunications service, it cannot fall under the exception in Section 201 of the Tax Code, allowing taxes on "telecommunication services purchased by an Internet service provider to deliver access to the Internet to its customers." 72 P.S. § 7201(rr)(3)(B). Thus, the 3CM service is exempt from tax as internet access under Section 201 of the Tax Code, 72 P.S. § 7201(rr)(3).

*Level 3 I*, 125 A.3d at 836-37. In so doing, the Court considered the technological aspects of the service at issue and rejected the Commonwealth's characterization of the service for the reasons set forth above.

The Commonwealth, here, presents largely the same issues and arguments that this Court addressed in our opinion in *Level 3 I* and presents no basis for abandoning our earlier reasoning. Contrary to what the Commonwealth contends, Level 3's 3CM service is materially different from the port modem management (PMM) service at issue in *AOL/Sprint*, and the Court in *Level 3 I* carefully examined and compared the services at issue in this case and in

*AOL/Sprint*, concluding that the services Sprint sold to AOL did not provide Internet access but that the service Level 3 sold to AOL did. The Commonwealth, in advancing its positon that Level 3 does not provide Internet access, ardently adheres to its assertion that AOL end-users are not "on the internet" when they arrive at AOL's data center. We disagree. To the contrary, end-users are already on the internet, having entered through Level 3's PoP and having been directed to www.aol.com. The Commonwealth maintains, however, that arrival at www.aol.com is not sufficient; rather, the end-users must be directed to what it refers to as the "public internet" in order for the tax exemption to apply and that www.aol.com is not the public internet. We agree with Level 3 that "[t]here is no generally recognized demarcation point that delineates the boundaries of the so-called 'public internet' as distinct from a private internet or internets," (Petitioner's Br. at 15), as the Internet is a collection of interconnected networks. When end-users are on www.aol.com, they are on the Internet, regardless of whether the website's content is proprietary or whether traffic is directed to AOL's data center. We further agree with Level 3 that its product—3CM—delivered end-users to the Internet, and it is irrelevant that AOL chose to have end-users routed first to www.aol.com.

As to the Commonwealth's reliance on *In the Matter of Business Data Services in an Internet Protocol Environment*, 31 F.C.C.R. 4723 (2016), a 383-page Tariff Investigation Order (Tariff Order) and Further Notice of Proposed Rulemaking (Further Order), issued by the Federal Communications Commission (FCC) on May 26, 2016, such reliance is misplaced. The FCC, in the Tariff Order, acknowledged that for several decades it "has struggled to find the best way to ensure that competitive benefits flow to customers, and onward to consumers, from

6

the provision of so-called 'special access'—business data service(s) (BDS) firms use to fulfill their enterprise–level broadband requirements." *Id.* at 4725. Recognizing that the marketplace for telecommunication services has been changing and competition is uneven, the FCC announced in its Tariff Order that it is initiating "reform by proposing to end the traditional use of tariffs for BDS services and discarding the traditional classification of 'dominant' and 'nondominant' carriers." *Id.* The FCC explained that its new regulatory framework is built on four fundamental principles: (1) competition is best, but where competition does not exist the government's role is to ensure that business customers are not disadvantaged; (2) the regulatory framework should be technology-neutral; (3) the FCC should remove barriers that may be inhibiting technology transitions; and (4) the FCC should construct regulations to meet not only today's marketplace, but tomorrow's as well. Applying those principles, the FCC declared unlawful certain terms and conditions in tariff pricing plans that the FCC found to be "unjust and unreasonable and [had] the effects of decreasing facilities-based competition and the transition to newer technologies." *Id.* at 4727. It also proposed in an "accompanying Further Notice to replace the existing, fragmented regulatory BDS structure with a new technology-neutral framework that classifies markets as either competitive . . . or as non-competitive." *Id.* The FCC explains that the Further Notice "[b]egins by surveying current marketplace conditions," "[p]roposes a set of de-regulatory rules to govern competitive markets," "[p]roposes a tailored set of rules to safeguard customers in non-competitive markets," "[p]roposes that tariffs should not be used in the future as part of the regulation of any BDS," "[p]roposes . . . future periodic data collection," and, "in order that the new regulatory framework be applied in a

technology-neutral manner, proposes to eliminate [a] current exemption" *Id.* According to the FCC, the Further Notice emphasizes that "no issue raised by the Further Notice is locked in stone; rather the [FCC] seeks broad comment on the best way to execute its principles, evaluate its proposals and answer its questions." *Id.* at 4727-28.

Although the Tariff Order concerns the FCC's development of a new regulatory framework to address competition in a changing marketplace, the Commonwealth cites the Tariff Order as a reiteration of the FCC's distinction between BDS, a telecommunications service subject to common carrier regulation, and "best efforts" Internet access services provided to residential end-users. The Commonwealth, citing just four paragraphs of the Tariff Order (three background paragraphs and one paragraph concerning the 2015 collection overview) and maintaining that the only difference between the telecommunications service that AOL purchased from Sprint in *AOL/Sprint* and the 3CM service that AOL purchased from Level 3 in the matter now before the Court is the *technology* that was utilized, argues that the 3CM service falls within the FCC's definition of BDS. The Commonwealth bases this argument on its characterization of the 3CM service as "a point-to-point telecommunications service interconnecting AOL's modems with AOL's data centers. [The] 3CM [service] provides no connection to the Internet and in no sense constitutes an Internet access service." (Commonwealth's Reply Br. at 3.) Thus, the Commonwealth's argument that the 3CM service is a BDS and, as such, a taxable telecommunication service, is premised on the same factual scenario already rejected by this Court, namely the Commonwealth's contention that the 3CM service does not deliver end-users to the Internet.

8

Because the Commonwealth's argument is based upon a factual premise rejected by this Court, it is unpersuasive and does not further its position.

Furthermore, the Commonwealth's reliance on this Court's statement in *Commonwealth v. A.J. Wood Research Company of Pennsylvania*, 431 A.2d 367 (Pa. Cmwlth. 1981) (*A.J. Wood*), that "[t]he law's concepts have sufficient vital capacity for growth to accommodate technological evolution," is misplaced. The Commonwealth contends that the difference between this case and *AOL/Sprint* is merely technological advancement and that, pursuant to *A.J. Wood*, the type of technology used to provide a service does not change the taxability of a service. The Commonwealth urges the Court to conclude that the services at issue in *AOL/Sprint* are the same as the services at issue here, but with changes that merely reflect the continuing development of technology. The Court, however, continues to disagree with the Commonwealth's characterization that the only difference between *AOL/Sprint* and this case is *how* the services were provided. Rather, the Court views the key difference as being *what* services were provided. As such, our decision in *A.J. Wood* does not advance the Commonwealth's position.

Finally, the Commonwealth also takes exception to this Court's denial of the Commonwealth's motion for reconsideration of the Court's order, dated April 30, 2015, denying the Commonwealth's petition to strike Level 3's brief as untimely and the finding that the Commonwealth's brief was not properly served. As we wrote in our earlier opinion, "we perceive no error with this decision." *See Level 3 I*, 125 A.3d at 837 n.16. Moreover, even if the Court were to conclude that the filing was late, the Court fails to discern how the Commonwealth was in any way prejudiced by the late filing, as the Court did not hear argument on this matter until September 17, 2015, four and one-half months following the Court's order

9

denying the Commonwealth's petition to strike Level 3's brief. Certainly, given the lapse of time between the filing of the brief and argument, the Commonwealth had sufficient time to prepare to address at argument Level 3's brief.

Accordingly, we overrule the Commonwealth's exceptions to the Court's opinion and order in *Level 3 I,* thereby confirming the Court's order of October 15, 2015.

_____
P. KEVIN BROBSON, Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Level 3 Communications, LLC,     :
                 Petitioner     :
                                  :
        v.                 :   No. 166 F.R. 2007
                                    :
Commonwealth of Pennsylvania,    :
                Respondent   :

# O R D E R

AND NOW, this 8th day of December, 2016, the exceptions filed by Respondent Commonwealth of Pennsylvania to this Court's opinion and order in *Level 3 Communications, LLC v. Commonwealth of Pennsylvania*, 125 A.3d 832, 836-37 (Pa. Cmwlth. 2015), are hereby OVERRULED. The order of the Board of Finance and Revenue in the above-captioned matter, dated March 30, 2007, is REVERSED, and Respondent's motion for reconsideration, dated April 30, 2015, remains DENIED.

<br>

                                         _____
                                         P. KEVIN BROBSON, Judge